WARFIELD v CITY OF WYANDOTTE

Docket No. 49621. Submitted April 6, 1982, at Detroit.—Decided June 9, 1982. Leave to appeal applied for.

Nancy L. Warfield, an 18-year-old girl, was admitted to the rehabilitation department of Wyandotte General Hospital because of a sudden and sizeable weight loss and emotional problems. She was a patient of the staff psychiatrist, Dr. Arthur Hughett. Dr. Hughett diagnosed anorexia nervosa and prescribed for Nancy three types of drugs and a program of recreational therapy such as attendance at ice shows and going on walks. Two days later, Dr. Hughett left on vacation and turned Miss Warfield over to the care of Dr. Walter Levick, his associate. Miss Warfield subsequently was taken on walks and attended an ice show. Five days later, Nancy Warfield died. James Warfield, administrator of the estate of Nancy L. Warfield, deceased, brought an action for medical malpractice in Wayne Circuit Court against the City of Wyandotte, Wyandotte General Hospital, Dr. Arthur Hughett and Dr. Walter Levick. The court, Irwin H. Burdick, J., entered a judgment for all of the defendants on a jury verdict of no cause of action. The plaintiff appeals alleging that the trial court erred in: (1) the manner in which it struck portions of the videotape deposition of the plaintiff's expert witness; (2) instructing the jury that the liability of the defendant hospital had to be predicated upon professional negligence rather than upon ordinary negligence; and (3) instructing the jury that no physician is required to guarantee results. *Held:*

1. No error requiring reversal occurred in the manner in which the testimony of the expert witness was excluded. When the videotape recording was played, the sound was turned off where the trial court had ordered the testimony stricken. The plaintiff voluntarily chose that method of editing the testimony. Furthermore, the plaintiff at the trial made no objection to leaving the picture on while the sound was turned off in those

REFERENCES FOR POINTS IN HEADNOTES
[1] 23 Am Jur 2d, Depositions and Discovery § 108.
[2] 57 Am Jur 2d, Negligence § 8.
[3] 61 Am Jur 2d, Physicians, Surgeons, and Other Healers § 363.

selected instances and did not object on that ground when moving for a new trial. The question of the propriety of the trial court's exclusion of the substance of certain parts of the expert's testimony was not preserved for appeal because the parties did not comply with the court rule dealing with videotape depositions.

2. The trial court did not err in instructing the jury that the liability of the hospital had to be predicated upon professional negligence rather than upon ordinary negligence because the basic issue was whether a patient whose own family doctor diagnosed the decedent as suffering from a psychiatric disorder and advised that she be admitted to the defendant hospital for psychiatric care was given the proper care in the hospital for the condition for which she was admitted. The matter requires professional training, skill and judgment. The instruction given by the trial court was a correct statement of the law.

3. The trial court did not err by instructing the jury that no physician is required to guarantee results. The instruction was not isolated but used as a preface to instructions on the degree of care required of physicians.

Affirmed.

1. EVIDENCE — VIDEOTAPE DEPOSITIONS.

The General Court Rules require that where a trial court makes a ruling sustaining an objection to a portion of a videotape deposition the objected-to portion must be stricken but retained for inclusion in a separate record; a trial court's order striking an objected-to portion of a videotape deposition must be in writing and it must specify the hours, minutes and seconds of the deposition which were excluded (GCR 1963, 315.6[3]).

2. NEGLIGENCE — JURY INSTRUCTIONS — HOSPITALS.

An instruction to the jury on ordinary negligence rather than professional negligence is proper in a suit against a hospital for the negligence of the hospital's employees where the acts complained of involve issues of ordinary negligence; however, where the acts complained of involve issues of professional negligence, an instruction to the jury on professional negligence is proper.

3. PHYSICIANS AND SURGEONS — JURY INSTRUCTIONS.

An instruction to the jury that a physician is not a guarantor of results, while being an accurate statement of the law, standing alone and without greater amplification could constitute error requiring reversal.

*Lopatin, Miller, Bindes, Freedman, Bluestone, Erlich & Rosen* (by *Steven G. Silverman*), for plaintiff.

*Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen,* for Wyandotte General Hospital.

*Schureman, Frakes, Glass & Wulfmeier,* for Dr. Hughett and Dr. Levick.

Before: ALLEN, P.J., and D. C. RILEY and R. R. FERGUSON,* JJ.

PER CURIAM. On October 31, 1979, following a two-week trial by a jury, a verdict of no cause of action was returned in favor of all defendants in this medical malpractice action arising out of the psychiatric care and treatment rendered to plaintiff's decedent, Nancy Lynn Warfield, between March 4th and March 14, 1974. Plaintiff's motion for a new trial was denied and an order pursuant thereto was entered on January 28, 1980. From that order plaintiff appeals of right.

Nancy Lynn Warfield was the adopted child of James and Ruth Warfield with whom she first came to live in 1961, when she was six years old. In the ensuing 12 years, she became very close to her grandmother who died in December, 1973. On January 4, 1974, Nancy developed an upper respiratory infection and was seen by her family physician, Dr. George Holmes. Dr. Holmes' office nurse was Ruth Warfield. At that time, Nancy weighed 123 pounds. Dr. Holmes prescribed medication and vitamin B-12 injections. On January 28, 1974, Nancy was again seen by Dr. Holmes who found that her weight had dropped to 103 pounds. Alarmed because of the sudden weight loss, Dr. Holmes ordered that Nancy be tested for mononu-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

cleosis. When the test came back positive, Dr. Holmes ordered that Nancy be placed in defendant Wyandotte General Hospital where she remained until released to her home February 8, 1974.

Early in March, 1974, Nancy asked her mother, "Mom, did you ever have a feeling you were going to die?" and made other statements indicating a premonition of death. Ruth Warfield called Dr. Holmes informing him that Nancy was not well and was emotionally disturbed. On March 4, 1974, Dr. Holmes again examined Nancy. Finding that her weight had dropped to 93 pounds and realizing that she had a psychiatric problem, Dr. Holmes suggested that Nancy be admitted to the rehabilitation department of Wyandotte General Hospital where she could be taken care of both physically and emotionally. She was admitted to the hospital on March 7, 1974, as the patient of the staff psychiatrist, defendant Dr. Arthur Hughett.

Dr. Hughett saw Nancy late in the afternoon of March 7th. His working diagnosis was anorexia nervosa. He prescribed for Nancy three types of drugs and a program of recreational therapy such as attendance at ice shows and going on walks. The recreational therapy program was designed to get a patient out of his or her depression. On March 9th, Dr. Hughett left on vacation turning the patient over to his associate, Dr. Walter Levick. On March 9th, Ruth Warfield visited her daughter and found her looking "very bad", appearing to be overdosed with drugs. She complained to the registered nurse in charge. There were no visiting hours on March 11th, however, Ruth Warfield talked to Nancy by phone that day. Nancy told her that she was bussed to watch an ice show that day and nearly froze to death. On March 13th, Nancy and other patients were

walked to a local bowling alley and back, about seven-tenths of a mile, one way. Later that day when her father, James Warfield, came to the hospital, Nancy complained to him that she almost froze on the long walk.

On March 14th, James Warfield again visited his daughter around 7 to 9 p.m. He found her hallucinating. He complained to the nurse and added that he thought she had an elevated temperature. About 11 p.m., an attendant went to Nancy's room to encourage her to eat and drink. Nancy refused to eat or drink and the attendant went to the kitchen, returning with food and drink which Nancy again refused to take. The attendant left the room to direct the start of intravenous injections previously ordered for Nancy. When he returned some ten minutes later, he found Nancy unconscious. Resuscitation measures proved ineffective and the patient was pronounced dead at approximately 12:15 a.m., March 15, 1974.

Plaintiff's complaint and theory of the case at the trial was that Nancy was improperly diagnosed as suffering from anorexia nervosa rather than severe depression which caused her not to eat or drink; that defendant doctors and the hospital failed to properly treat the patient in accordance with the accepted standard of practice by prescribing the drugs Thorazine, Cogentin and Navana, which were contraindicated and caused depression of the respiratory system; that the hospital and defendant doctors departed from the proper standard of practice by ordering Nancy to go on long walks which caused further injury and damage; that the hospital and defendants departed from the accepted standard of practice by not sufficiently noting the patient's severe malnutrition and emotional problems and by failing to treat her

therefor in time; and that Nancy died of malnutrition as a result of the neglect and failure to properly observe and treat the condition and the symptoms for which she was hospitalized. Defendants' theory was that Nancy's condition was properly diagnosed and that she was given the appropriate prescriptions and that she did not die from malnutrition or starvation, although the cause of her death was unknown.

After deliberating only one and one-half hours, the jury returned a verdict of no cause of action. Plaintiff's motion for a new trial was denied on January 16, 1980, and an order in accordance therewith was entered on January 28, 1980. From that order, plaintiff appeals of right raising three issues.

I. *Did the trial court err in the manner in which it struck portions of the videotape deposition of plaintiff's expert witness?*

Dr. Emanuel Tanay, plaintiff's only expert witness, testified by videotape *de bene esse* deposition.[1] At the request of defense counsel, certain portions of the videotape testimony were struck by the trial court during discussion in chambers between counsel and the trial judge. Unfortunately, a transcript of Dr. Tanay's full deposition was not filed with this appeal. Only the deposition testimony admitted at the trial was transcribed in the record. However, plaintiff's brief sets forth four instances of the stricken testimony. Plaintiff contends that err occurred in both the manner in which the testimony was excluded and in the substance of the material stricken. We disagree.

---

[1] *De bene esse:* conditionally or provisionally in anticipation of being used in case the witness cannot afterwards be examined in court. Such testimony is subject to future challenge and must then stand or fall according to its intrinsic merit and regularity. Black's Law Dictionary (4th ed), p 476.

When the videotape recording was played, the sound was turned off at places where the trial court had ordered the testimony stricken. The picture remained on and the jury could see the witness's lips moving, could see the witness becoming visibly agitated, but could not hear what the witness was saying. Plaintiff contends that this prejudiced him. However, there is no showing that during the in-chambers conference the trial court ordered the manner in which the deletions were to be made. Rather, it appears that the party offering the deposition, plaintiff here, voluntarily chose that method to edit the testimony. Furthermore, plaintiff made no objection at the trial to leaving the picture on while the sound was turned off in those selected instances and did not object on that ground when moving for a new trial. In fact, plaintiff did not seize upon that ground for error until plaintiff filed a supplemental brief after receiving defendants' briefs on appeal. We find no error.

The question of the propriety of the trial court's exclusion of the substance of certain parts of Dr. Taney's testimony is not preserved for appeal because GCR 1963, 315, the special court rule dealing with videotape depositions, was not complied with. That rule provides in relevant part:

".6 Use as Evidence.

\* \* \*

"(3) In the event that the court shall sustain an objection to any portion of a visual deposition, he shall order the inadmissible portion of the deposition stricken. *All such excluded portions of the deposition shall be retained and shall constitute a separate record of the matters therein contained.* The order excluding objectionable material shall be in writing and shall

specify the hours, minutes and seconds of the deposition to be excluded." (Emphasis supplied.)

Strict compliance with the rule is necessary. *Gorshe v Watersmeet Twp School Dist,* 106 Mich App 300; 308 NW2d 167 (1980). In that case, as in the instant case, none of the testimony, objections or rulings were transcribed and a separate record of the excluded material was not prepared. On appeal, this Court found that the alleged errors in the trial court's rulings were not properly preserved for appeal.

"Second, subrule 315.6(3) states that when any ruling sustaining an objection is made the court must order the excluded portion stricken. All excluded material must be retained and shall constitute a separate record. The order is to be in writing and it must specify the hours, minutes and seconds of the deposition which were excluded. Because no order was entered specifying the excluded material and, perhaps, the basis for the rulings, we are further hampered in our ability to review plaintiff's claim; although the deposition was not transcribed into the record, review might still have been possible if plaintiff had submitted the videotape and the order required by subrule 315.6(3). Under GCR 1963, 315.9, an appellate court may give leave to view portions of the videotape, upon a party's request, but in such cases the party must still file a transcript of pertinent portions of the deposition.

"The failure of the parties and the court to proceed under GCR 1963, 315 precludes our review of plaintiff's assertion regarding the material excluded from the videotaped deposition. This case illustrates the necessity for care when modern technology invades the courtroom. The drafters of the court rule anticipated many of the problems which could arise; it is now up to the bench and the bar to implement the rule. Otherwise, a procedure which is intended to better enable the jury to weigh the evidence by seeing and hearing witnesses who cannot be present in person will instead wreak

havoc with regard to a party's right to full appellate review." *Gorshe, supra,* 302-303. (Footnotes omitted.)

II. *Did the trial court err in instructing the jury that the liability of defendant hospital had to be predicated upon "professional negligence", rather than upon "ordinary negligence"?*

This issue pertains only to the liability of defendant hospital. As to its standard of care, the trial court instructed the jury as follows:

"Now with respect to professional negligence in malpractice, when I use the words, 'professional negligence' in malpractice with respect to the defendant's conduct, I mean the failure to do something which the usual ordinary physician or surgeon or hospital of ordinary learning, judgement *[sic]* or skill in our community would do or the doing of something which the usual, ordinary physician or surgeon or hospital of ordinary learning, judgement *[sic]* or skill would not do under the circumstances which you find to exist in this case in March of 1974.

"Consequently, when the words 'professional negligence' are used with respect to the conduct of the hospital in its professional dealings with the plaintiff, I mean the failure to use that degree of diligence, skill and knowledge in Wyandotte, Michigan or simular *[sic]* community in light of the knowledge of the medical profession as it existed in March of 1974.

"I further charge you that Wyandotte General Hospital can only act through its agents, servants and employees and if you find that such agents, servants employees, nurses or other personnel were professionally negligent and/or malpractice in the care or treatment of the plaintiff's decedent *[sic]*, and that such professional negligence and/or malpractice was the proximate cause of the plaintiff decedent injuries or death, then the hosptial *[sic]* is liable for the acts of its agents, servants and employees acting on behalf of the hospital."

Plaintiff's counsel promptly objected stating in relevant part:

"*  *  * I object, as I indicated to the court in chambers, to you giving the additional charges which place an additional burden on the plaintiffs in regard to gaurantor [sic] and the other aspect of the malpractice as to Wyandotte General Hospital because I believe that the Wyandotte General Hospital in this case can be held guilty of ordinary negligence in regard to the care and treatment of this patient, namely on the testimony of Dr. Tanay and the testimony of the mother when she pointed this information out to them and they did nothing about it.

"I think that is ordinary negligence and not professional negligence."

The thrust of plaintiff's argument is that the failure of the hospital's nursing staff and attendants to more adequately take care of the patient when the patient's mother complained to them and when the patient was so obviously ill and dehydrated constitutes ordinary negligence. Where the acts complained of involve issues of ordinary negligence and instruction on ordinary negligence rather than professional negligence is proper. *Fogel v Sinai Hospital of Detroit,* 2 Mich App 99; 138 NW2d 503 (1965), *Gold v Sinai Hospital of Detroit, Inc,* 5 Mich App 368; 146 NW2d 723 (1966). That is not the situation in the instant case where the basic issue involved was whether a patient, whose own family doctor diagnosed the decedent as suffering from a psychiatric disorder and advised that she be admitted to defenant hospital for psychiatric care, was given the proper care in the hospital for the condition for which she was admitted. Obviously, the answer to that question requires professional training, skill, and judgment. Therefore, the instruction given by the trial court was a

correct statement of the law. As was stated in *Starr v Providence Hospital,* 109 Mich App 762, 765-766; 312 NW2d 152 (1981), a case factually similar to the case before us:

"Plaintiffs' allegations of negligence at trial involved the supervision necessary in the 'special care unit' and the type of restraints that should have been used on the elderly patient.

"The cases relied upon by plaintiffs, *Fogel v Sinai Hospital of Detroit,* 2 Mich App 99; 138 NW2d 503 (1965), and *Gold v Sinai Hospital of Detroit,* 5 Mich App 368; 146 NW2d 723 (1966), involve issues of ordinary negligence and are distinguishable from the case at bar. Both *Fogel* and *Gold* were cases involving patients who fell while being assisted by nurses.

"The issues in the case at bar, with regard to the degree of supervision in the 'special care unit' and the adequacy of restraints, are issues involving professional judgments which are beyond the common knowledge and experience of laymen to judge."

III. *Did the trial court err by instructing the jury that no physician is required to guarantee results?*

Despite defendant doctors' assertion to the contrary, the following instruction is found in the transcript:

"Now no physician can be required to guarantee results, but the law demands that they bring and apply to the case at hand that degree of skill and care, knowledge and attention ordinarily possessed and ex-cercised *[sic]* by other physicians and surgeons in the same specialty under like circumstances."

Plaintiff's counsel made a timely objection to the instruction on the record and also raised the issue in his motion for a new trial.

In *Cleveland v Rizzo,* 99 Mich App 682; 298

NW2d 617 (1980), this Court held that, while an instruction that a physician is not a guarantor of results is an accurate statement of the law, such an instruction standing alone and without greater amplification could constitute reversible error. *Id.,* 685. In this case, the trial court did not give the "guarantee" instruction in an isolated manner but used it as as a preface to the instruction that the law requires that physicians "bring and apply to the case at hand that degree of skill and care, knowledge and attention ordinarily possessed and exercised by other physicians and surgeons in the same specialty under like circumstances". We believe that constitutes amplification required under *Rizzo.* The instruction is a correct statement of the law *(Berwald v Kasal,* 102 Mich App 269; 301 NW2d 499 [1980]), not standing naked and bare without the garment of amplification.

Affirmed. No costs.