**Abdolreza BAGHERZADEH, et al., Plaintiffs-Appellants,**

v.

**Waldomar M. ROESER, M.D., and Orthopedic Surgery Association, P.C., Defendants-Appellees.**

**No. 84–1413.**

United States Court of Appeals, Sixth Circuit.

Argued April 21, 1986.

Decided July 31, 1987.

---

Norman D. Tucker, Southfield, Mich., Rudolph Serra (argued), for plaintiffs-appellants.

Michelle A. Thomas (argued), Detroit, Mich., for defendants-appellees.

Before WELLFORD and NELSON, Circuit Judges, and EDWARDS, Senior Circuit Judge.

DAVID A. NELSON, Circuit Judge.

This is a medical malpractice action in which the plaintiff appeals from a judgment entered on a jury verdict in favor of the defendants, an orthopedic surgeon and the professional corporation of which the surgeon was a member. The sole question presented is whether, under Michigan law, the trial court committed reversible error in charging the jury that a doctor cannot be held to guarantee the results of his treatment. Finding no such error, we shall affirm the judgment.

On August 17, 1979, Plaintiff Abdolreza Bagherzadeh, a teen-ager, was badly injured in a car accident. He was admitted to the emergency room at St. Joseph Mercy Hospital in Ann Arbor, Michigan, and was diagnosed as having suffered a ruptured spleen, displaced fractures of the right and left femurs, and fractured cervical vertebrae. A splenectomy was performed immediately. Defendant Waldomar Roeser, M.D., an orthopedic surgeon affiliated with the hospital, thereafter began treatment for the thigh fractures by placing the plaintiff in bilateral skeletal traction.

By early October of 1979 the plaintiff's fractures had stabilized sufficiently to permit him some movement. Dr. Roeser applied cast braces to both legs. These cast braces, which incorporated aluminum bars that allowed movement of the knee joint, were removed after eleven days; the plaintiff was not tolerating the cast braces well, according to Dr. Roeser, and a return to traction seemed to be indicated. X-rays taken in late October showed significant angulation, or bowing, of the right femur.

Skeletal traction remained the method of treatment through most of November. On November 24, 1979, while still in the hospital, the plaintiff refractured his left leg. Dr. Roeser told the plaintiff and his sister that it would be best to nail the left femur, and that operation was performed the following day. The plaintiff was discharged from the hospital on crutches in mid-January of 1980. He says in his complaint that he suffered a delayed union of the left femur and malunion of the right femur, with the result that his right leg is shorter than the left.

In a deposition that was read to the jury at trial, the plaintiff's medical expert, Dr.

Austin Rohrbaugh, expressed the opinion that it was improper for Dr. Roeser to have applied the cast braces in early October because the braces would not adequately stabilize the fracture sites. Dr. Rohrbaugh was of the further opinion that the bowing of the plaintiff's right leg was the result of the cast bracing. The defendants, in response, presented the testimony of Dr. Thomas O'Keefe—like Dr. Roeser a clinical instructor of orthopedic surgery at the University of Michigan—who testified that treatment with cast braces following traction met the applicable standard of care. Dr. O'Keefe testified that the mobility permitted by cast braces would prevent muscle wasting and joint stiffness, and he said that in his experience patients' fractures healed more quickly when cast braces were applied. The doctor testified further that there would have been a risk of angulation of the fracture even if a "spica cast"—an alternative suggested by the plaintiff's expert—had been employed.

Dr. Roeser testified to the actual course of treatment. He said he had outlined to the plaintiff and his family the various methods by which the fractures could be treated—including application of a spica cast—but was given to understand that the spica cast was abhorrent to the family. A double hip spica cast "is a very difficult thing to tolerate, ... no question," according to Dr. Roeser's testimony.

The jury was presented with a special verdict form consisting of six questions. The first two asked whether Dr. Roeser was "professionally negligent" and whether any such negligence was a proximate cause of the plaintiff's injuries. Only if the jury answered both of those questions affirmatively was it to consider the remaining four questions, which dealt with the extent of the plaintiff's own negligence, if any, and the amount of damages. The jury answered the first question in the negative, finding that Dr. Roeser had not been professionally negligent.

Our task is to decide whether the trial court committed prejudicial error in the instructions it gave the jury in connection with the first question. Those instructions, given as part of a more general charge and coupled with detailed instructions relating to each of the remaining five questions, read as follows:

"Just because someone is injured and suffers a disability after treatment by a doctor, does not[,] without more, entitle you to hold that there was professional negligence.

"The difficulties and uncertainties in the practice of medicine are such that no one can be required to guarantee results. All the law demands is that the individuals involved bring and apply to the case in hand that degree of skill, care, knowledge and attention ordinarily possessed and exercised by practitioners of that branch of the medical profession of which that person practices under like circumstances. The mere fact that an adverse result may occur following orthopedic treatment is not in itself any evidence of professional negligence.

"The mere fact that the plaintiff may have experienced a complication, in and of itself, is not[,] without other evidence, sufficient proof to support a finding that the defendants were professionally negligent.

"When I use the words 'professional negligence', I mean the failure to do something which an orthopedic surgeon of ordinary learning, judgment or skill in orthopedics would do, or the doing of something which an orthopedic surgeon of ordinary learning, judgment or skill would not do, under the same or similar circumstances you find to exist in this case.

"In determining what an orthopedic surgeon of ordinary learning, judgment and skill would or would not do you should look at the evidence as it relates to the standard of practice of orthopedic surgeons.

"The standard of practice applicable to the defendant in this case is a national standard applicable to orthopedic surgeons throughout the country. You are to base your judgment of this issue on the testimony in this case of those persons who have knowledge of the standard of practice of orthopedic surgeons

regardless as to where they may be located.

"The standard of care for a specialist should be that of a reasonable specialist practicing medicine in light of present day scientific knowledge; therefore, geographical consideration of [sic] circumstances control neither the standard of a specialist's care of [sic] the competence of the expert's testimony.

"It is the duty of a physician in diagnosing a case, to use reasonable care and diligence in ascertaining all available facts and collecting data essential to a proper diagnosis."

■ Although state law controls the substantive content of jury instructions in diversity actions such as this, "federal law governs our standard of review for determining whether a jury instruction is prejudicial." *Teal v. E.I. DuPont de Nemours and Company,* 728 F.2d 799, 802 (6th Cir. 1984). The "critical inquiry is whether the instructions as a whole provide the jury with sufficient guidance concerning the issues to be tried." *Id.* Even a charge that contains an "inaccurate or ambiguous statement does not constitute reversible error if the inaccuracy or ambiguity is unlikely to mislead the jury." *Id.*

■ The proposition that a doctor cannot be required to guarantee the results of his treatment accurately states the law of Michigan. As early as 1915 the Michigan Supreme Court recognized that the uncertainties of medical practice are such that "no practitioner can be required to guarantee results," and that "all the law demands" is that a doctor apply the "degree of skill, care, [and] knowledge ... ordinarily possessed and exercised" by like practitioners. *Zoterell v. Repp,* 187 Mich. 319, 153 N.W. 692, 695–96 (Mich.1915). This rule of law, almost universally recognized outside of Michigan, *Watson v. Hockett,* 107 Wash.2d 158, 163, 727 P.2d 669 (1986), has been endorsed repeatedly by Michigan courts over the ensuing decades. *Roberts v. Young,* 369 Mich. 133, 119 N.W.2d 627, 629 (1963); *Viland v. Winslow,* 34 Mich. App. 486, 191 N.W.2d 735, 737 (1971). As recently as 1980 a Michigan Court of Appeals declared that "a jury instruction to the effect that a physician is not a warrantor of cure or diagnosis.... is a correct statement of Michigan law." *Berwald v. Kasal,* 102 Mich.App. 269, 301 N.W.2d 499, 503 (1980). And in *Warfield v. City of Wyandotte,* 117 Mich.App. 83, 323 N.W.2d 603 (1982), a Michigan appellate court affirmed a judgment for the defendants in a medical malpractice action where the "guarantee" instruction had been given over objection by the plaintiff.

The fact that the challenged instruction accurately states the Michigan law is not necessarily dispositive of the question presented here, however. In its recent opinion in two cases considered together and reported under the style *Jones v. Porretta,* 428 Mich. 132, 405 N.W.2d 863 (1987), the Michigan Supreme Court declared that even though "no guarantee" instructions may accurately state the law as a general proposition, such instructions may still be improper if they are not "concise, understandable, conversational, unslanted, and nonargumentative," and if they would be misleading in light of the particular theories and proofs presented in the specific case under consideration. Pointing out that the propriety of all jury instructions must be determined by the trial court "not in an abstract or theoretical sense, but in the context of the 'personality' of the particular case on trial, and with due regard for the adversaries' theories of the case," (quoting *Johnson v. Corbet,* 423 Mich. 304, 327, 377 N.W.2d 713 (1985)), the Michigan court held that the propriety of a "no guarantee" instruction must be determined on a case-by-case basis.

In *Jones v. Porretta* itself, a "no guarantee" instruction was held not to have been erroneous. In the companion case of *Dziurlikowski v. Morley,* on the other hand, the giving of a similar instruction was held to constitute reversible error. The facts and "personality" of our case bear a closer resemblance to *Jones* than to *Dziurlikowski,* and as a matter of both federal law (see *Teal v. E.I. DuPont de Nemours and Co.,* 728 F.2d 799, 802, *supra*) and Michigan law, we are satisfied that there was no

reversible error in the instructions given here.

Like the case at bar, *Jones* was an action against an orthopedic surgeon who was accused, among other things, of having failed to apply a proper cast to a broken leg. There was direct evidence of negligence, as in the case at bar, and the plaintiff was not required to rely on the doctrine of *res ipsa loquitur.* The trial court charged that "[n]o physician can be required to guarantee results," and balanced that instruction with an affirmative definition of the duty of care owed by physicians: "the law demands that they bring and apply to the case at hand that degree of skill and care, knowledge and attention ordinarily possessed and exercised by other orthopedic surgeons in the same specialty under like circumstances." The Michigan Supreme Court held that on the facts presented in *Jones,* the "no guarantor" charge, balanced as it was by a correct "standard of care" charge, was not misleading.

*Dziurlikowski,* by way of contrast, went forward at trial on a theory of *res ipsa loquitur.* The defendant in that case was an anesthesiologist whose patient was operated on for bleeding ulcers and had his gallbladder removed at the same time. After the operation it was found that the plaintiff could not use his arm as before because of a brachial plexus palsy. The Michigan court held that the situation was one in which the doctrine of *res ipsa loquitur* might appropriately be applied; that being so, the court concluded that the "no guarantor" instruction, when coupled with an instruction to the effect that an adverse result is not evidence of negligence, "had the potential to mislead the jury as to a permissible inference which the jury might draw from the plaintiffs' proofs." 428 Mich. at 156, 405 N.W.2d 863.

Taken as a whole, the instructions in the case at bar adequately informed the jury of the defendant's duty to exercise the degree of learning, judgment or skill that would ordinarily be exercised by comparable specialists, under the same or similar circumstances, regardless of where in the nation such specialists might be located. As in *Dziurlikowski,* the trial court did add that "the mere fact that an adverse result may occur ... is not in itself any evidence of professional negligence;" because the case at bar was not tried on a *res ipsa loquitur* theory, however, just as *Jones* was not, the quoted language was not misleading or otherwise prejudicial.

The judgment of the district court is AFFIRMED.