929 F.2d 700
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Gardner Fain DAMRON, Jr., Plaintiff-Appellant,
v.
AUTO-OWNERS INSURANCE COMPANY, Defendant-Appellee.
 No. 90-5745.
 United States Court of Appeals, Sixth Circuit.
 April 3, 1991.
 
 On Appeal from the United States District Court for the Western District of Tennessee, No. 87-01158; Todd, J.
 W.D.Tenn.
 AFFIRMED.
 Before MILBURN and BOGGS, Circuit Judges, and DEMASCIO, Senior District Judge*.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant Gardner Damron, Jr., appeals from a judgment entered on a jury verdict for defendant-appellee Auto-Owners Insurance Company ("Auto-Owners") in this diversity action alleging liability for fire damage under a homeowner's insurance policy. For the reasons that follow, we affirm.
 
 I.
 A.
 
 2
 On August 25, 1987, plaintiff filed this action in the Circuit Court of Weakley County, Tennessee. Auto-Owners removed the action to federal district court on the basis of diversity of citizenship. Beginning April 25, 1990, the case was tried before a jury. On April 27, 1990, the jury returned a defendant's verdict. The district court entered judgment on the jury verdict on April 30, 1990, and plaintiff filed a notice of appeal to this court on May 30, 1990.
 
 B.
 
 3
 In the early morning hours of March 27, 1987, a fire damaged plaintiff's home located at 505 Church Street in Martin, Tennessee. The dwelling was occupied by plaintiff and his roommate of approximately one year, Larry Smith. Plaintiff's home was insured by Auto-Owners under a policy which was in full force and effect at the time of the fire with the coverage limited to $30,000 on the dwelling, $15,000 on the contents, and an additional $6,000 for living expenses. Auto-Owners paid off plaintiff's mortgage but refused to pay plaintiff's claim for damages.
 
 
 4
 The fire originated on the back porch of the dwelling which was enclosed and used as a utility room. There was a washer and dryer on the back porch as well as a 220 volt electrical outlet. None of the appliances, however, were plugged into the outlet, and there had been no prior electrical problems on the back porch.
 
 
 5
 At the time of the fire, the doors and windows of the house were locked, and there was no evidence afterward of forced entry. Appellant testified that on the night of the fire he retired at approximately 12 midnight. He was awakened by his roommate at about 4 or 5 a.m. and told that the house was on fire. Plaintiff exited the dwelling through the side exit completely unclothed accompanied by his roommate who was clad only in a pair of gym shorts. Plaintiff testified that as he exited the dwelling he observed flames in the utility room. Plaintiff stated that his roommate broke out a window in the front of the home and retrieved some clothing for plaintiff.
 
 
 6
 After plaintiff clothed himself, he left in his automobile headed for the fire department. On his way, plaintiff met a police officer, J.D. Sanders, and informed him of the fire. Plaintiff then drove to his restaurant which his mother and father were preparing to open for the day. In the meantime, Officer Sanders contacted the fire department and proceeded on toward the house to arrive at the dwelling before the fire department. Upon his arrival at the house, Sanders found a person clad only in a pair of gym shorts who identified himself as an occupant of the home. Plaintiff, driven by his father, arrived back at the burning house shortly afterward.
 
 
 7
 When fire chief Buster Williams arrived at the scene, efforts were already being made to combat the fire. As soon as the flames were extinguished, Williams entered the back porch where the fire appeared to have originated. Williams cleaned the porch and washed away the debris in an attempt to determine the cause of the fire. Williams' suspicions were raised because of "the amount of fire that was on the back porch at the time the fire department arrived" and because a fireman found a window broken out in the front of the house with glass on the inside of the house.
 
 
 8
 Later that morning, Williams returned to the scene accompanied by Mr. Bill Yates and Mr. Jerry Riggs of the state fire marshal's office. After "inventorying the premises" and "looking around in the debris," the three men did not find any signs of arson.
 
 
 9
 Thereafter, at Auto-Owners' request, Riggs and Yates returned to the scene to conduct a more extensive investigation. Both Riggs and Yates observed a burn pattern on the floor of the utility room. They also found a hole in the north wall of the utility room near the 220 volt outlet. One of the wires leading to the outlet was severed with a bead of material at each end of the wire indicating that the wire had melted. Riggs and Yates learned that dirty clothes had been piled on the floor of the utility room at or near where the fire began. They concluded that the presence of the clothes was consistent with the possibility that the clothes held heat in and created the burn pattern found on the floor. Although Riggs and Yates could not identify the cause of the fire, both stated that it was not arson.
 
 
 10
 Auto-Owners then asked Gary Haun, a former employee of the state fire marshal's office, to investigate the fire. Haun visited the scene eight days after the fire and found a two-gallon gasoline can still sitting near the door of the utility room. Haun took a series of photographs and samples. Samples of carpet and shavings from the rear utility room were sent to a forensic chemist and found to contain evidence of gasoline. From burn patterns on the windows and rear door entrance of the utility room, Haun surmised that the fire was exiting the windows and doorways from the top downward, indicating a fire that was highly concentrated in the utility room. Charring of the walls all the way down to the floor indicated that the fire originated on the floor of the utility room.
 
 
 11
 According to Haun, burn patterns on the floor were the distinctive markings of a flammable liquid pour pattern. Haun discounted the possibility that the fire originated with an electrical malfunction citing several reasons. No appliances were plugged into the outlet at the time of the fire to cause an overload. Haun also found it significant that the structural wood around and above the outlet was still intact. According to Haun's analysis, fires burn upward and outward in a "V" pattern. If the fire had originated at the outlet, Haun surmised, the structural supports above the outlet would have been consumed and very little damage would have been evident below the outlet. In this case, damage below the outlet was much the same as the damage above the outlet.
 
 
 12
 Based on Haun's observations at the scene, his experience, and the laboratory analysis indicating the presence of an accelerant, Haun offered the professional opinion that the fire was deliberately started by pouring gasoline on the floor of the utility room. Plaintiff's explanation of the presence of gasoline in the utility room was that clothes piled on the floor of the utility room included those of his roommate, some of which the roommate had worn while repairing a vehicle.
 
 
 13
 At trial, evidence was offered concerning the plaintiff's motive to burn the house. Besides paying plaintiff for the contents of the house and some incidental expenses, the policy would have paid plaintiff and his mortgage company $30,000 if the house were a total loss. If plaintiff could have collected on the policy, he could have netted approximately $6,000 above the purchase price of $23,500.
 
 
 14
 At the time of the fire, plaintiff had been the owner and operator of a restaurant (where his parents were working on the morning of the fire) for approximately two years. The restaurant was losing money as evidenced by plaintiff's tax returns. Plaintiff's 1985 return showed a loss of $5,000, and his 1986 return showed a loss of approximately $3,000. Plaintiff's mother and father worked in the restaurant to help reduce expenses.
 
 
 15
 The restaurant was plaintiff's sole source of income, and, besides making payments on the restaurant equipment, plaintiff was obligated to make payments on his automobile and his house. The record also shows that on March 13, 1987, two weeks before the fire, plaintiff was bound over to the grand jury of Weakley County on charges of possession of marijuana with intent to resell and possession of a schedule II drug. Thus, plaintiff faced the additional expense of employing an attorney to represent him in the criminal matter. The record indicates that plaintiff had often successfully turned to his father for financial assistance; however, it is not clear from the record that plaintiff's father was willing to provide plaintiff a living indefinitely since plaintiff testified that for a period of time after the fire he incurred living expenses in the form of rent paid to his father.
 
 
 16
 The issues presented for review are (1) whether, in a civil action where the insurer raises an arson defense, the trial court is required to instruct the jury that plaintiff is presumed innocent of the charge of arson; and (2) whether the evidence "preponderated" against the verdict.
 
 II.
 A.
 
 17
 The first issue raised by plaintiff concerns the jury instructions given with regard to the arson defense. The district court instructed the jury that "the insurer Auto-Owners Insurance Company has the burden of establishing an arson defense by a preponderance of the evidence, not beyond a reasonable doubt." T. 275. Plaintiff concedes that a preponderance of evidence is sufficient to establish the arson defense; however, plaintiff argues that even in a civil case, where the defense raised imputes criminal wrongdoing, the person accused of the illegal conduct is entitled to a presumption of innocence. Therefore, plaintiff argues that the district court erred in failing to instruct the jury that he was presumed innocent of arson.
 
 
 18
 Auto-Owners points out that plaintiff failed to object to the jury instruction before the jury retired to consider its verdict. Rule 51 of the Federal Rules of Civil Procedure prohibits a party from assigning "as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."
 
 
 19
 Ordinarily the appellant's failure to object to the trial court's instructions precludes appellate review of the alleged error. However, appellate courts retain the discretion to review errors not preserved for appeal in those exceptional cases where the errors are so obvious and prejudicial as to affect the fairness of judicial proceedings.
 
 
 20
 Gomez v. Great Lakes Steel Division, National Steel Corp., 803 F.2d 250, 256 (6th Cir.1986). This court has applied the above rule in an unpublished opinion to foreclose consideration of an argument almost identical to plaintiff's. Cuzco Precision Products, Inc. v. The Aetna Casualty and Surety Co., No. 82-1122 (6th Cir. July 6, 1983).
 
 
 21
 Moreover, there is no merit to plaintiff's argument. Plaintiff is unable to offer any authority holding that a court must instruct as to a presumption of innocence in a civil case. Plaintiff can only point to language from some old Supreme Court of Tennessee cases which arguably recognize that a plaintiff, in the face of a defense which imputes criminal wrongdoing, may "invoke the legal presumption of innocence." McBee v. Bowman, 89 Tenn. 132, 14 S.W. 481, 483 (1890); see Fleming v. Wallace, 116 Tenn. 20, 91 S.W. 47, 49 (1905). Those cases offer plaintiff little support as they reject arguments that the jury should be instructed that a plea of justification must be proven by a heightened burden of proof in favor of the "modern rule ... that only a preponderance of evidence is necessary to support the plea of justification in an action imputing crime." Fleming, 116 Tenn. at ..., 91 S.W. at 49. This rule applies specifically to an arson defense. Fleming, 91 S.W. at 48-49; Hendrix v. Insurance Company of North America, 675 S.W.2d 476, 480 (Tenn.Ct.App.1984).
 
 
 22
 Although research has not produced a Tennessee case directly on point, in a case in which an employee, Todd, filed a civil action to recover from his employer, Roberts, for overtime pay that he had been promised, the Tennessee Court of Appeals stated: "If Roberts had so promised Todd, it would have been a violation of law and subject to severe penalties under the Wage Stabilization policies in effect at the time; as to any criminal penalties, there would be a prima facie presumption that defendant had not violated the law; as to the civil penalties, there is no presumption of innocence...." Todd v. Roane-Anderson Co., 35 Tenn.App. 687, 251 S.W.2d 132, 135 (1952) (cert. denied by Supreme Court of Tennessee) (emphasis added).
 
 
 23
 In the unpublished case of Cuzco, No. 82-1122, mentioned earlier, this court was presented with the argument that in a diversity case applying Michigan law the court should have instructed the jury that the plaintiff "was presumed to be innocent of arson absent compelling and persuasive circumstantial evidence to the contrary." This court rejected the possibility that failure to give the instruction could amount to plain error for reasons that apply equally to Tennessee law: "The standard 'presumption of innocence' equates to 'beyond a reasonable doubt' which is an unduly high and inappropriate standard in such civil cases. And as regards circumstantial evidence, the court repeatedly admonished the jury as to the meaning of circumstantial evidence and the impropriety of drawing other than 'reasonable inferences' therefrom."
 
 
 24
 Similarly, in this case, the district court made it clear that the inferences drawn from circumstantial evidence must not be "too remote" and must be of "sufficient force to bring minds of ordinary intelligence to a persuasion of incendiarism by a fair preponderance of the evidence." The jury instructions as a whole provided the jury with sufficient guidance concerning the issues to be tried. Bagherzadeh v. Roeser, 825 F.2d 1000, 1003 (6th Cir.1987). We believe that it is highly unlikely that the Supreme Court of Tennessee would allow, much less require, the instruction that plaintiff belatedly requests. In any event the instructions given were not so deficient as to require reversal where no objection was made to the proposed instructions.
 
 B.
 
 25
 Plaintiff next argues that the evidence preponderates against the verdict. The record reflects that plaintiff did not make a motion for a directed verdict at the end of all proof or file motions for judgment notwithstanding the verdict or, in the alternative, for a new trial after the jury's verdict. Since none of these motions were raised before the district court, we will consider this issue waived and not address it for the first time on appeal. See Portage II v. Bryant Petroleum Corp., 899 F.2d 1514, 1522 (6th Cir.1990) ("[A] party who has failed to move for a directed verdict at the close of all the evidence, can neither ask the district court to rule on the legal sufficiency of the evidence supporting a verdict for his opponent nor raise the question on appeal."); Dixon v. Montgomery Ward, 783 F.2d 55 (6th Cir.1986) (failure to move for a new trial or J.N.O.V. precludes appeal based on the weight of the evidence).
 
 III.
 
 26
 For the reasons stated, the judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable Robert E. DeMascio, Senior United States District Judge for the Eastern District of Michigan, sitting by designation