**STATE of Utah, Plaintiff and Appellee,**

v.

**Steven Douglas THURMAN, Defendant and Appellant.**

No. 910494.

Supreme Court of Utah.

Jan. 7, 1993.

**1258**

R. Paul Van Dam, David B. Thompson, Richard G. MacDougall, Salt Lake City, for plaintiff and appellee.

Robert Van Sciver, Salt Lake City, for defendant and appellant.

ZIMMERMAN, Justice:

Steven Douglas Thurman appeals from an interlocutory order denying his motion to suppress evidence linking him to a fatal bomb explosion. He is charged with aggravated murder, a capital felony, Utah Code Ann. § 76–5–202(1), delivering an infernal machine, a second degree felony, *id.* § 76–10–307, and construction of an infernal machine, a third degree felony, *id.* § 76–10–308. We affirm.

The facts are largely undisputed. Eleven-year-old Adam Cook was killed by a pipe bomb explosion in his father's vehicle on the night of May 15, 1991. On the night following the bombing, a federal magistrate issued a warrant to search Thurman's apartment. The application for the warrant requested authorization to enter the apartment without giving notice (a "no-knock" entry) at any time of the day or night. The application was accompanied by the affidavit of Special Agent Conner of the Federal Bureau of Alcohol, Tobacco & Firearms ("ATF"). The affidavit recited the findings of the agent's investigation and concluded, inter alia, that there was reason to believe that Thurman possessed illegal destructive devices in his apartment and his vehicle and that a no-knock entry was necessary for public safety. However, the magistrate did not authorize a no-knock entry and issued a warrant restricting the search to the hours between 6 a.m. and 10 p.m.

At 6:14 a.m. on May 17th, law enforcement officers from the Murray City Police Department and ATF executed the warrant. Within less than thirty seconds after knocking on Thurman's apartment door, the officers used a ramming device to force their way in. Six officers entered Thurman's 650–square–foot apartment with weapons drawn, simultaneously announcing their identity and intent. Thurman was in bed, naked and asleep, and offered no resistance when the officers approached and handcuffed him. During the handcuffing, Thurman's nose was injured and began bleeding. Paramedics attended to Thurman's injury at the scene, and an officer informed him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The record is unclear as to when the officers allowed him to dress, but by 7:30 a.m., he was clothed.

Shortly thereafter, Thurman signed two preprinted consent forms to allow the officers to search two automobiles and a cab-over camper. Prior to signing, he was read the consent form verbatim. During this time, the officers learned that Thurman rented a garage-type storage unit in nearby Midvale and asked Thurman to sign another preprinted consent form to search the unit.[1] One of the officers told Thurman that the storage unit would be

---

1. The trial court did not make any factual findings regarding how the officers discovered the existence of the storage unit, nor is the record helpful on this point. However, the record establishes and the State concedes that the officers did not know of the storage unit before the search.

searched with or without his consent.[2] At 7:40 a.m., Thurman signed the consent form, which was identical to the previous forms except for the specification of the search target.

Between 8:30 a.m. and 9:30 a.m., Thurman was again informed of his *Miranda* rights. At 11 a.m., an officer removed Thurman's handcuffs, and he accompanied the officers to the storage unit. Upon arrival, Thurman opened the combination lock to the unit and the officers opened the door. Before the officers entered, Thurman was asked to sign a second preprinted consent form to allow the officers to search the unit. After an officer went over the form with him, Thurman signed it at 11:29 a.m. and was placed back into handcuffs. The search of the storage unit proceeded until about 12:30 p.m. or 1 p.m. The police formally arrested Thurman at 2:30 p.m.

At trial, Thurman moved to suppress any evidence found in his apartment and storage unit during the May 17th searches. After an evidentiary hearing, the trial court denied Thurman's motion. The court first ruled that the affidavit supporting the warrant was sufficient to establish probable cause for the search and that the warrant was properly issued. The court then ruled that the officers had executed the warrant in violation of section 77–23–10(1) of the Code, Utah's "knock-and-announce statute." The knock-and-announce statute provides that an officer may enter a premises forcibly "[i]f, after notice of his [or her] authority and purpose, there is no response or he [or she] is not admitted with reasonable promptness." Utah Code Ann. § 77–23–10(1). The court found that the violation occurred when, without no-knock authorization, "the officers made a mere perfunctory knock and seconds later made a forced entry." However, the court held that despite the illegal entry of Thurman's apartment, the evidence found in the storage unit was admissible because Thurman's consents to search the storage unit were voluntary under *State v. Whittenback*, 621 P.2d 103 (Utah 1980), and were not tainted by the illegal search under *State v. Arroyo*, 796 P.2d 684 (Utah 1990).[3]

On appeal, Thurman raises two claims. First, he argues that the trial court erred in finding the search warrant valid because the warrant application was based on stale and insufficiently specific information that undermined the probable cause for the search. Second, he claims that the trial court erred in finding that his consents to search the storage unit were voluntary and were not the product of the exploitation of an illegality under *Arroyo*.[4] In response to Thurman's second claim, the State concedes that the trial court was correct in holding that the officers' entry into Thurman's apartment violated section 77–23–10(1), but argues that the court appropriately applied *Arroyo* in finding the consents to be valid.

We turn first to Thurman's attack on the validity of the search warrant and begin with the appropriate standard of review. In reviewing the magistrate's finding of probable cause to support a search

---

**2.** Thurman testified that after an officer asked him to sign the consent form, he "slightly hesitated," at which point one of the officers said, "We are going to get these anyway." Thurman testified that the officer was "referring to the search warrants." The trial court specifically found that such a statement was made to Thurman. The State does not challenge that finding.

**3.** The trial court found that the search of Thurman's apartment was "fruitless" because "[r]elevant evidence was acquired only from a search of the storage area...." Based on this finding, we assume that the prosecution will not proffer evidence found in Thurman's apartment or vehicles. We address only the trial court's ruling as to the admissibility of evidence found in Thurman's storage unit.

**4.** Thurman did not raise any claims under the search and seizure provision of article I, section 14 of the Utah Constitution. We therefore do not address any issues pertinent to the search under the Utah Constitution. *See State v. Lafferty*, 749 P.2d 1239, 1247 n. 5 (Utah 1988), *habeas corpus granted on other grounds, Lafferty v. Cook*, 949 F.2d 1546 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992).

warrant based on an affidavit, we will find the warrant invalid only if the magistrate, given the totality of the circumstances, lacked a "substantial basis" for determining that probable cause existed. *State v. Babbell,* 770 P.2d 987, 991 (Utah 1989); *State v. Hansen,* 732 P.2d 127, 129 (Utah 1987); *State v. Leonard,* 825 P.2d 664, 673 (Utah Ct.App.1992). In conducting this review, we will consider the search warrant affidavit in " 'its entirety and in a common-sense fashion' " and give "great deference" to the magistrate's decision. *Babbell,* 770 P.2d at 991 (quoting *State v. Anderson,* 701 P.2d 1099, 1102 (Utah 1985)). The affidavit must support the magistrate's decision that there is a "fair probability" that evidence of the crime will be found in the place or places named in the warrant.[5] *See id.* (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)).

We now address the merits. Thurman argues that the affidavit recites information that is either stale or insufficiently specific to support a finding of probable cause. His staleness argument challenges the magistrate's reliance on alleged events suggesting that he had a motive to commit the crime. His lack-of-specificity argument challenges the magistrate's reliance on alleged facts suggesting that he actually committed the crime.

■ We first consider Thurman's staleness argument. Staleness issues usually arise when a significant lapse of time occurs between the discovery of information suggesting that evidence of the crime can be found at a particular locale and the magistrate's finding of probable cause or the execution of the warrant. *See, e.g., Hansen,* 732 P.2d at 131; *State v. Stromberg,* 783 P.2d 54, 56–57 (Utah Ct.App. 1989). The concern is whether so much time has passed that there is no longer probable cause to believe that the evidence is still at the targeted locale. *See* 2 Wayne R. LaFave, *Search & Seizure* § 3.7(a), at 75–76 (2d ed. 1987) [hereinafter *Search & Seizure* ]. Thurman's argument is a variation of this theme. He argues that so much time passed after the alleged events suggesting that he had a motive to commit the crime that by the time the warrant was issued, there was no longer reason to believe that he still had such a motive. Even assuming, however, that the same staleness concepts apply to a probable cause determination of motive, we find Thurman's argument unpersuasive.

Viewing the affidavit in its entirety and in a common-sense fashion, we conclude that the affidavit sufficiently supports a finding that a fair probability existed that Thurman had a motive to commit the crime and that his motive was still present the night of the bombing. Agent Conner's affidavit summarizes interviews with four witnesses that strongly suggest that Thurman held an obsessive hatred for Adam Cook's father, Howard Cook, stemming from an affair that Thurman's ex-wife had with Howard Cook while Thurman and his ex-wife were still married. For example, the affidavit states that one witness said that about six months prior to the bombing, Thurman hired a private investigator to watch Howard Cook and Thurman's ex-wife and that Thurman was "extremely angry" and "hates" his ex-wife as a result of the divorce. Thurman's ex-wife reported that several months prior to the bombing, she and Howard Cook saw Thurman watching them from a car parked near her apartment. Based on these and other allegations in the affidavit, the magistrate easily could have found a fair probability that Thurman continued to harbor resentment against Howard Cook. *Cf. Hansen,* 732 P.2d at 131.

---

**5.** The standard we use to review a magistrate's finding of probable cause to issue a search warrant is taken from federal law. Later in this opinion, we conclude that we are not bound by federal standards of review in considering state trial court determinations of federal questions absent an express statement to the contrary by Congress or the United States Supreme Court. Because the instant parties do not contest the standard of review of a magistrate's probable cause determination and Utah courts uniformly apply the standard articulated in the text, we see no reason to reconsider the standard of review for this issue.

We next consider Thurman's specificity argument. In making this argument, Thurman challenges the nexus between him and the commission of the crime. The affidavit essentially identifies four pieces of information tying Thurman to the crime: (i) information suggesting a motive, which we have just addressed and found not to be stale; (ii) information that Thurman purposely learned about Howard Cook's concerns and patterns of travel, as suggested by his hiring of the private investigator; (iii) information that a male telephoned Howard Cook's employer the day before the bombing and said that a bomb was in one of the company trucks; and (iv) information that a small two-door car left the area where the bombing took place, at a high rate of speed and with its lights out, and that Thurman owned a Chevrolet Monza, which is a small two-door car.

The information indicating that a male made a bomb threat and that both the suspect and Thurman drove small two-door cars clearly would be insufficient to establish probable cause if it were the only information in the affidavit. *Cf. Babbell*, 770 P.2d at 992 & n. 3. However, a common-sense evaluation of the other information in the affidavit supports the conclusion that Thurman held an obsessive hatred for Cook and that this hatred motivated him to take highly unusual actions toward Cook. Thus, taking the affidavit in its entirety, we conclude that "the magistrate had a 'substantial basis' for determining that there was a 'fair probability' that a search would uncover evidence." *Id.* at 992 (quoting *Gates*, 462 U.S. at 238–39, 103 S.Ct. at 2332) (1983). Thurman's challenge to the specificity of the evidence consequently fails.

Thurman next contends that the trial court erred in holding that his consents to search the storage unit were voluntary and were not obtained by exploitation of the officers' violation of the knock-and-announce statute. Utah Code Ann. § 77–23–10(1).

Before addressing Thurman's arguments, we consider a closely related issue raised by the State. Although the State concedes that the officers violated the knock-and-announce statute, it suggests that we interpret the statute to establish a minimum time period that officers must wait between announcing their identity and purpose and entering. We need not address the State's suggestion to resolve this case, but we believe that the importance of the interests protected by the statute warrants addressing the State's proposition.

The knock-and-announce statute allows an officer to enter a residence only if, after giving notice of his or her authority or purpose, the officer is "not admitted with reasonable promptness." *Id.* The State urges that we interpret this provision to establish a minimum waiting period that may be waived under exigent circumstances. Such a period, the State hopes, would provide a clear-cut standard by which the police may tailor their behavior to avoid violating the knock-and-announce statute or any constitutional rights it may protect. The State suggests thirty seconds as a minimum "reasonable" period for the police to wait between announcing their presence and entering.

We recognize the interest of law enforcement in a bright-line standard; however, we decline the State's invitation to establish such a standard. A determination of "reasonable promptness" under the statute must be made under all the circumstances, which obviously vary from search to search. As the Ninth Circuit has observed in construing the federal knock-and-announce statute, "The interval of time an officer must wait between announcement and entry depends on the circumstances of each case." *United States v. McConney*, 728 F.2d 1195, 1206 (9th Cir.1984) (en banc); *accord United States v. Streeter*, 907 F.2d 781, 789 (8th Cir.1990), *overruled on other grounds, United States v. Wise*, 976 F.2d 393 (8th Cir.1992) (en banc). Because of the variability in circumstances, it would be imprudent to attempt to establish a mini-

mum time period. In addition, we think that a minimum time period, even if it was no more than a rebuttable presumption, would deflect the executing officers' attention from the factual details necessary to make a realistic determination of "reasonable promptness" and increase the likelihood of danger both to the officers and the occupants of the targeted premises.

We return to the issue of whether Thurman's consents were voluntary and whether they were obtained by exploitation of the prior illegality. The holding of the trial court and the parties' arguments center on *State v. Arroyo*, 796 P.2d 684 (Utah 1990). There, we held that a defendant's consent to a search following illegal police activity is valid under the Fourth Amendment only if both of the following tests are met: (i) The consent was given voluntarily, and (ii) the consent was not obtained by police exploitation of the prior illegality. *Id.* at 688; *see also Sims v. Collection Div. of the State Tax Comm'n*, 841 P.2d 6, 10 & n. 8 (Utah 1992); *cf. State v. Allen*, 839 P.2d 291, 300 (Utah 1992). The parties correctly recognize that the second test—the exploitation analysis—is triggered only if the prior illegality is a violation of the Fourth Amendment. *See New York v. Harris*, 495 U.S. 14, 19, 110 S.Ct. 1640, 1643–44, 109 L.Ed.2d 13 (1990) (citing *United States v. Crews*, 445 U.S. 463, 471, 100 S.Ct. 1244, 1250, 63 L.Ed.2d 537 (1980)). Accordingly, Thurman argues that the knock-and-announce statute is "grounded in the Fourth Amendment" and, therefore, the officers' entry in violation of the statute is an abridgment of his "substantive Fourth Amendment rights." The State, on the other hand, argues that we do not need to reach the issue of whether the knock-and-announce statute embodies Fourth Amendment rights because if we find that the two tests of *Arroyo* are met and consequently hold that Thurman's consents are valid, the issue becomes immaterial.

■ Because "judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them," *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445, 108 S.Ct. 1319, 1323, 99 L.Ed.2d 534 (1988), we take the course suggested by the State. Therefore, we proceed to the *Arroyo* analysis without deciding whether a violation of the Utah knock-and-announce statute is also a violation of the Fourth Amendment.

Our review of the case law reveals some confusion among Utah courts in the application of *Arroyo* and in the standard of review of trial court findings made under *Arroyo*. In light of the unsettled nature of the law in this area and the importance of *Arroyo* to the disposition of the present case,[6] we take this opportunity to clarify the analyses that trial and appellate courts should use in considering the validity of a defendant's consent to search following police illegality. We first discuss the analytical framework to be used in making the voluntariness and exploitation determinations and then discuss the appropriate standards of review.

■ We start with the voluntariness determination. Voluntariness is primarily a factual question, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–60, 36 L.Ed.2d 854 (1973), and the analysis used to determine voluntariness is the same without regard to whether the consent was obtained after illegal police conduct. If the court determines that the consent was not voluntary, no further analysis is required: the consent is invalid, and the proffered evidence must be excluded. *Arroyo*, 796 P.2d at 688; *State v. Valdez*, 748 P.2d 1050, 1056 (Utah 1987); *State v. Whittenback*, 621 P.2d 103, 106 (Utah 1980).

In *Arroyo*, we said that "whether the requisite voluntariness exists depends on

---

**6.** In addition, the State suggests that *Arroyo* has been erroneously applied in at least two lower court cases, *State v. Sims*, 808 P.2d 141 (Utah Ct.App.1991), *cert. pending; State v. Park*, 810 P.2d 456 (Utah Ct.App.), *cert. denied,* 817 P.2d 327 *and* 826 P.2d 651 (Utah 1991), and offers its own analytical framework under *Arroyo* in support of the trial court's findings.

'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of' police conduct." 796 P.2d at 689 (quoting *Schneckloth,* 412 U.S. at 226, 93 S.Ct. at 2047); *accord State v. Robinson,* 797 P.2d 431, 437 (Utah Ct. App.1990). Our cases before *Arroyo* make clear that both the "characteristics of the accused" and the "details of police conduct" must be considered in determining whether a defendant's consent was actually a product of his or her free will. *See Valdez,* 748 P.2d at 1056; *Whittenback,* 621 P.2d at 106 n. 14. The prosecution bears the burden of proving that the defendant's consent was voluntary. *State v. Iacono,* 725 P.2d 1375, 1377 (Utah 1986) (per curiam); *Whittenback,* 621 P.2d at 106; *State v. Durand,* 569 P.2d 1107, 1108 (Utah 1977); *State v. Lopez,* 22 Utah 2d 257, 261, 451 P.2d 772, 775 (1969).

The second determination to be made in deciding whether a consent following police illegality is valid is "whether the consent was obtained by police exploitation of the prior illegality," *Arroyo,* 796 P.2d at 688; *see also Sims,* 841 P.2d at 10; *cf. Allen,* 839 P.2d at 300, or in other words, "whether the 'taint' of the Fourth Amendment violation was sufficiently attenuated to permit introduction of the evidence," *Harris,* 495 U.S. at 19, 110 S.Ct. at 1643–44 (citing *Crews,* 445 U.S. at 471, 100 S.Ct. at 1436). The principle underlying the exploitation test is that the Fourth Amendment should not permit law enforcement to "ratify their own illegal conduct by merely obtaining a consent after the illegality has occurred." *Arroyo,* 796 P.2d at 689. *Arroyo*'s primary goal was to deter the police from engaging in illegal conduct even though that conduct may be followed by a voluntary consent to the subsequent search.

The deterrence rationale discussed in *Arroyo* is grounded in the United States Supreme Court's decision in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). There, Justice Powell, in a concurring opinion joined by now Chief Justice Rehnquist, made it clear that the analysis used to invalidate consent on the basis of exploitation was grounded firmly in the deterrent purposes of the exclusionary rule. *Id.* at 608–12, 95 S.Ct. at 2264–66. Justice Powell's admonition that the exploitation analysis "always should be conducted with the deterrent purpose of the Fourth Amendment exclusionary rule sharply in focus," *id.* at 612, 95 S.Ct. at 2266, has become a cornerstone of search and seizure jurisprudence. *See* 4 *Search & Seizure* § 11.4(a), at 373; *see also* Anthony G. Amsterdam, *Search, Seizure, and Section 2255: A Comment,* 112 U.Pa.L.Rev. 378, 390 (1964) [hereinafter Amsterdam].

With this principle in mind, we turn to the factors to consider in determining whether a consent is sufficiently attenuated from prior police illegality to permit the introduction of the resulting evidence. In *Arroyo,* we said that courts should consider "the purpose and flagrancy of the official misconduct," the "temporal proximity" of the illegality and the consent, and "the presence of intervening circumstances." 796 P.2d at 691 n. 4 (citing *Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62); *see also Sims,* 841 P.2d at 10; *cf. Allen,* 839 P.2d at 300–01. We elaborate on each of these factors in turn.

The "purpose and flagrancy" factor directly relates to the deterrent value of suppression. *See Brown,* 422 U.S. at 608–12, 95 S.Ct. at 2264–66 (Powell, J., concurring); 4 *Search & Seizure* § 11.4(b), at 397; Joseph G. Casaccio, Note, *Illegally Acquired Information, Consent Searches and Tainted Fruit,* 87 Colum.L.Rev. 842, 857 (1987) [hereinafter Casaccio]; *cf. State v. Buck,* 756 P.2d 700, 703 (Utah 1988) (Zimmerman, J., concurring). As Justice Powell noted in *Brown,* "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right." 422 U.S. at 612, 95 S.Ct. at 2266 (Powell, J., concurring) (quoting *Michigan v. Tucker,* 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974)). Thus, if the

police had no "purpose" in engaging in the misconduct—for example, if the illegality arose because we later invalidated a statute on which the police had relied in good faith—suppression would have no deterrent value. *See id.; cf. United States v. Ceccolini,* 435 U.S. 268, 279–280, 98 S.Ct. 1054, 1061–62, 55 L.Ed.2d 268 (1978). At the other extreme, if the purpose of the misconduct was to achieve the consent, suppression of the resulting evidence clearly will have a deterrent effect and further analysis rarely will be required. *See Brown,* 422 U.S. at 610–11, 95 S.Ct. at 2265–66 (Powell, J., concurring). Similarly, if the misconduct is flagrantly abusive, there is a greater likelihood that the police engaged in the conduct as a pretext for collateral objectives, and suppressing the resulting evidence will have a greater likelihood of deterring similar misconduct in the future.[7] *See id.*

In most cases, consideration of purpose and flagrancy will not end the exploitation inquiry. Courts should also consider the time that elapsed between the illegality and the giving of the consent and the presence or absence of intervening events that might be relevant to attenuation. *Arroyo,* 796 P.2d at 691 n. 4. The deterrence principle also underlies these factors. *See United States v. McCraw,* 920 F.2d 224, 230 (4th Cir.1990). The deterrent value of suppressing evidence seized following police illegality is negligible where the subsequent consent to search is substantially separated either temporally or circumstantially from that illegality. *See Brown,* 422 U.S. at 610, 95 S.Ct. at 2265 (Powell, J., concurring); *cf. United States v. Delgadillo-Velasquez,* 856 F.2d 1292, 1300 (9th Cir. 1988). As one commentator has noted,

> Where the chain between the challenged evidence and the primary illegality is long or the linkage can be shown only by "sophisticated argument," exclusion would seem inappropriate. In such a

case it is highly unlikely that the police officers foresaw the challenged evidence as a probable product of their illegality; thus it could not have been a motivating force behind it. It follows that the threat of exclusion could not possibly operate as a deterrent in that situation.

Comment, *Fruit of the Poisonous Tree—A Plea for Relevant Criteria,* 115 U.Pa. L.Rev. 1136, 1148–49 (1967), *quoted in* 4 *Search & Seizure* § 11.4(a), at 374; *accord* Casaccio at 857–58.

As the foregoing should suggest, the exploitation analysis requires a balancing of the relative egregiousness of the misconduct against the time and circumstances that intervene before the consent is given. The nature and degree of the illegality will usually be inversely related to the effectiveness of time and intervening events to dissipate the presumed taint. Where the misconduct is extreme, we will require a clean break in the chain of events between the misconduct and the consent to find the consent valid. For example, Justice Powell in *Brown* suggested that, where it appears from the facts that the police purposely engaged in the conduct to induce a confession, an intervening consultation with counsel or presentation before a magistrate may be required before the taint can be removed. 422 U.S. at 611, 95 S.Ct. at 2265–66 (Powell, J., concurring). The same type of break should be required where the evidence shows that the police purposely engaged in conduct to induce a consent. Conversely, where it appears that the illegality arose as the result of negligence, the lapse of time between the misconduct and the consent and the presence of intervening events become less critical to the dissipation of the taint. *Cf. Buck,* 756 P.2d at 701–03 (holding that suppression is not required where police forcefully entered premises mistakenly thinking they were executing a no-knock warrant, target residence was unoccupied at time of entry, and

---

7. We acknowledge "that a determination of what must be done in the interest of deterrence must involve a fair degree of speculation 'until much more is known about the way deterrence works in fact than now seems knowable.'" 4 *Search & Seizure* § 11.4(a), at 373 (quoting Amsterdam at 390).

police properly announced their presence when defendant arrived at scene).

In sum, to find that a defendant's consent following police illegality is valid under the Fourth Amendment, the prosecution must prove (i) that the defendant's consent was given voluntarily, i.e., that the consent was the product of his or her own free will; and (ii) that the consent was not obtained by exploitation of the prior illegality, i.e., that the connection between the consent and the prior illegality was sufficiently attenuated that excluding the evidence would have no deterrent effect. *See Arroyo*, 796 P.2d at 688. "Evidence obtained in searches following police illegality must meet both tests to be admissible." *Id.*

We now turn to the standard of review appellate courts are to follow in reviewing a trial court's determinations under *Arroyo*. Because we find a good deal of conflict and confusion in the Utah precedent on this question, *see* infra pages 1268–69, we undertake a complete examination of the standard of review in this area. We begin with the standard to be used when considering a challenge to a trial court's determination of voluntariness.

At the outset, we note that the federal appellate courts seem to have settled upon a standard of review for considering federal trial court determinations of voluntariness of consent for Fourth Amendment purposes. In *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the United States Supreme Court stated that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a *question of fact* to be

determined from the totality of all the circumstances." *Id.* at 227, 93 S.Ct. at 2047–48 (emphasis added). The Court in *United States v. Mendenhall*, 446 U.S. 544, 557–60, 100 S.Ct. 1870, 1878–80, 64 L.Ed.2d 497 (1980), citing *Schneckloth*, applied a deferential standard of review in overturning a federal court of appeals' decision reversing a district court's finding of voluntariness. The *Mendenhall* Court wrote, "[B]ecause the trial court's finding was sustained by the record, the Court of Appeals was mistaken in substituting for that finding its view of the evidence." 446 U.S. at 557, 100 S.Ct. at 1879.[8]

The State argues that in considering a state trial court's determination of the voluntariness of consent for Fourth Amendment purposes, *Schneckloth* and *Mendenhall* require this court to apply the same standard of review used by federal appellate courts. However, the State does not cite to any authority for this position and does not explain its reasoning. It simply assumes that the appropriate standard of review is a question of federal law. Our own research has revealed little case law or secondary authority on this point. However, after reflecting on the principles governing the choice of a particular standard of review and considering the law on analogous questions, we have concluded that this court is not required to apply federal standards of review when presented with challenges to trial court determinations made under federal law. Because this issue seems to have received relatively little attention, some explanation is in order.

It is widely agreed that the primary function of a standard of review is to apportion power and, consequently, responsibility be-

---

**8.** Since *Mendenhall* was decided, the federal circuits appear to apply uniformly the clearly erroneous standard of review when considering a voluntariness of consent determination. *See, e.g., United States v. Analla*, 975 F.2d 119, 125 (4th Cir.1992); *United States v. McKines*, 933 F.2d 1412, 1423 (8th Cir.1991); *United States v. Oguns*, 921 F.2d 442, 448 (2d Cir.1990); *United States v. Valencia*, 913 F.2d 378, 381 (7th Cir. 1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991); *United States v. Bu-*

*chanan*, 904 F.2d 349, 355 (6th Cir.1990); *United States v. Baskin*, 886 F.2d 383, 387 (D.C.Cir. 1989), *cert. denied*, 494 U.S. 1089, 110 S.Ct. 1831, 108 L.Ed.2d 960 (1990); *United States v. Vasquez*, 858 F.2d 1387, 1389 (9th Cir.1988), *cert. denied*, 488 U.S. 1034, 109 S.Ct. 847, 102 L.Ed.2d 978, *cert. denied sub nom. Arias Gomez v. United States*, 489 U.S. 1029, 109 S.Ct. 1161, 103 L.Ed.2d 220 (1989); *United States v. Cherry*, 794 F.2d 201, 205 (5th Cir.1986); *United States v. Recalde*, 761 F.2d 1448, 1457 (10th Cir.1985).

tween trial and appellate courts for determining an issue or a class of issues. *See, e.g., State v. Sykes,* 840 P.2d 825, 829, (Utah Ct.App.1992) (Jackson, J., concurring); *Davis v. United States,* 564 A.2d 31, 36 (D.C.1989); Paul D. Carrington et al., *Justice on Appeal* 130 (1976); Patrick W. Brennan, *Standards of Appellate Review,* 33 Def.L.J. 377, 377 (1984); Ronald R. Hofer, *Standards of Review—Looking Beyond the Labels,* 74 Marq.L.Rev. 231, 232 (1991) [hereinafter Hofer]; Henry P. Monaghan, *Constitutional Fact Review,* 85 Colum.L.Rev. 229, 234–35 (1985) [hereinafter Monaghan]. Put another way, a standard of review allocates discretion between trial and appellate courts. In determining the appropriateness of a particular allocation of responsibility for deciding an issue or a class of issues, account should be taken of the relative capabilities of each level of the court system to take evidence and make findings of fact in the face of conflicting evidence, on the one hand, and to set binding jurisdiction-wide policy, on the other. *See, e.g., Miller v. Fenton,* 474 U.S. 104, 114–15, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985); *United States v. Ortiz,* 878 F.2d 125, 126–27 (3d Cir.1989); *United States v. Daughtrey,* 874 F.2d 213, 217–18 (4th Cir.1989); *United States v. McConney,* 728 F.2d 1195, 1201–02 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984); *Davis,* 564 A.2d at 36–37. In short, the choice of the appropriate standard of review "turn[s] on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question." *Pierce v. Underwood,* 487 U.S. 552, 559–60, 108 S.Ct. 2541, 2547, 101 L.Ed.2d 490 (1988) (quoting *Miller,* 474 U.S. at 114, 106 S.Ct. at 451); *accord Salve Regina College v. Russell,* — U.S. —, —, 111 S.Ct. 1217, 1222, 113 L.Ed.2d 190 (1991). *See generally* Hofer at 237–41.

The appropriate standard of review to be applied to the determination of any particular issue or class of issues is fixed by reference to the pertinent source of law, be it constitution, statute, rule, or appellate court decision. *See* Maurice Rosenberg, *Appellate Review of Trial Court Discretion,* 79 F.R.D. 173, 173–75 (1975) [hereinafter Rosenberg]. In Utah, the supreme court has, in addition to common law power, constitutional authority to manage the appellate process, Utah Const. art. V, § 1, art. VIII, §§ 1, 4, as well as inherent supervisory authority over all courts of this state. *E.g., State v. Brown,* — P.2d —, 201 Utah Adv.Rep. 4, 7 (Nov. 30, 1992); *State v. Gardner,* 789 P.2d 273, 290 (Utah 1989) (Zimmerman, J., concurring), *cert. denied,* 494 U.S. 1090 (1990); *State v. Florez,* 777 P.2d 452, 458 (Utah 1989); *State v. James,* 767 P.2d 549, 557 (Utah 1989); *In re Criminal Investigation,* 754 P.2d 633, 653 (Utah 1988); *State v. Bishop,* 753 P.2d 439, 499 (Utah 1988) (Zimmerman, J., concurring in the result); *In re Clatterbuck,* 700 P.2d 1076, 1081 (Utah 1985). Unless constrained by a constitutional or statutory provision, we exercise our powers to fashion standards of review that we think best allocate responsibility between appellate and trial courts in light of the particular determination under review. Based on the foregoing, we conclude that the allocation of responsibility, or discretion, between trial and appellate courts is a matter of peculiar and close importance to the courts in question, and we see no reason why our authority to define standards of review should not extend to cases where the determination under review is a question of federal law.

We are aware that we must follow federal standards of review when expressly mandated to do so by Congress or the United States Supreme Court as a matter of substantive federal law.[9] However, absent such a mandate, we think that the

---

9. *See, e.g., Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502 (1984) (holding that as a matter of "constitutional responsibility" un-

der First Amendment, appellate courts must independently review determinations of actual malice); *Chapman v. California,* 386 U.S. 18, 21, 87 S.Ct. 824, 826, 17 L.Ed.2d 705 (1967) (holding

standard of review is a question to be determined by the law of the forum performing the appellate review.

Our conclusion that the standard of review used by state courts is presumptively a question of state law is supported by the fact that federal appellate courts characterize the standard of review as a matter of procedural, rather than substantive, law in analogous situations. In *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986), the United States Supreme Court addressed whether a federal court of appeals applied the correct standard of review under a provision of the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 213(b). The merits of the case are unimportant for our purposes, but it is important to note that at one point in the opinion, Chief Justice Rehnquist, writing for the Court, observed that state appellate courts reviewing state trial court determinations under the FLSA are not bound by Federal Rule of Civil Procedure 52(a), which sets forth the federal standard of review for findings of fact. The Chief Justice wrote, "[S]tate courts are not required to apply Rule 52(a)—a rule of *federal* civil procedure—to their own appellate system for reviewing factual determinations of trial courts." 475 U.S. at 712, 106 S.Ct. at 1529 (emphasis in original).

Similarly, in diversity cases, where federal courts are presented only with questions of state substantive law but are controlled by federal procedural law, federal appellate courts take the view that the standard of review to be applied to federal trial court determinations is a matter of procedure. Consequently, federal standards of review are applied in diversity cases. *See, e.g., Lozier v. Auto Owners Ins. Co.*, 951 F.2d 251, 253 (9th Cir.1991); *First State Bank of Denton v. Maryland Cas. Co.*, 918 F.2d 38, 42 (5th Cir.1990); *Martinez v. Asarco, Inc.*, 918 F.2d 1467, 1470 n. 3 (9th Cir.1990);

*Bagherzadeh v. Roeser*, 825 F.2d 1000, 1003 (6th Cir.1987). In sum, under federal law, the standard of review is ordinarily a matter of procedure governed by the law of the forum, regardless of the underlying substantive issues.

Our conclusion that absent an express federal statement to the contrary, state courts are not bound by federal standards when reviewing state trial court determinations of federal constitutional issues is also supported by federal law pertaining to standing and to burdens of proof on certain federal constitutional questions. For example, state courts are not bound by federal standing rules when reviewing federal constitutional claims. *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 8 n. 2, 108 S.Ct. 2225, 2231 n. 2, 101 L.Ed.2d 1 (1988); *Pennell v. San Jose*, 485 U.S. 1, 8, 108 S.Ct. 849, 855–56, 99 L.Ed.2d 1 (1988). In *Provo City Corp. v. Willden*, 768 P.2d 455 (Utah 1989), we relied on *New York State Club Ass'n* and *Pennell* in holding that the United States Constitution's Article III requirement of a "case or controversy," upon which federal standing rules are based, is a limitation that has no application to Utah courts. *Id.* at 456–57. As a consequence, we found that a plaintiff had standing to raise a First Amendment challenge to an ordinance even though he would not have had standing under federal law. *Id.* at 457.

Similarly, when deciding the appropriate burden of proof for federal constitutional questions for which the Supreme Court has not expressly required a certain quantum of proof as a matter of substantive law, state courts are not bound to follow the federal law governing burdens of proof so long as the state standard is at least as favorable to the defendant as the federal. In *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1972), the Supreme Court observed that states

that state courts must apply federal harmless error rules because reversibility of an error constitutes a "federal question"); *School Comm. of Franklin v. Commissioner of Educ.*, 17 Mass.

App. 683, 462 N.E.2d 338, 343–44 (1984) (holding that standard of review mandated by 20 U.S.C. § 1415(e)(2) preempts state standard of review).

are free to impose higher burdens of proof on the prosecution than the federal preponderance standard when proving the voluntariness of a confession under the federal constitution. *Compare Lego with United States v. Matlock,* 415 U.S. 164, 177–78, 94 S.Ct. 988, 996–97, 39 L.Ed.2d 242 (1974) (stating that federal trial courts must use preponderance standard in reviewing voluntariness of consent determinations).

Having concluded that absent an express federal declaration to the contrary, we are not bound by federal law in fixing standards of review, we note that we have found no federal statute or case that would compel us to follow a federal standard of review for the issue before us. Therefore, we now turn to fixing the appropriate standard of review to be used by Utah appellate courts in reviewing trial court determinations of voluntariness of consent for purposes of deciding whether a search is reasonable under the Fourth Amendment.

We first consider our prior cases. Those decisions appear to say that the voluntariness of consent is a question of historical fact—whether the defendant's consent was, in fact, a product of his or her free will—to be reviewed under the clearly erroneous standard. *See, e.g., Arroyo,* 796 P.2d at 687, 689; *State v. Griffin,* 626 P.2d 478, 480 (Utah 1981); *State v. Durand,* 569 P.2d 1107, 1108–09 (Utah 1977); *State v. Tuttle,* 16 Utah 2d 288, 292, 399 P.2d 580, 582, *cert. denied,* 382 U.S. 872, 86 S.Ct. 129, 15 L.Ed.2d 110 (1965); *State v. Louden,* 15 Utah 2d 64, 67, 387 P.2d 240, 242 (1963). However, none of these cases has expressly considered the question of the appropriate standard of review; we have simply assumed that the federal standard of review governed. Moreover, upon close examination, in most of these cases we appear not to have actually applied the clearly erroneous standard, but to have engaged in an independent consideration of the facts to determine whether the trial court's ultimate conclusion that the consent was voluntary or involuntary was correct.

The failure of our past opinions to consider carefully the appropriate standard of review and to actually apply the declared standard is not surprising. A similar lack of clarity in the statement of the appropriate standard of review and a similar dissonance between the stated and applied standards are evident in other areas of this court's jurisprudence. *See infra* note 11. As discussed above, a standard of review represents an allocation of power between appellate and trial courts respecting an issue or a class of issues. Over the many years when this court was the only appellate court in Utah, it was relatively easy for the fine points of the articulation and application of standards of review to evade intensive scrutiny. The members of this court could internalize general notions about the allocation of power between this court and the trial courts without closely examining those notions and without always being scrupulous in applying the nominal standard of review; any missteps could be corrected readily in the next case and without much consequence for the law.

With the creation of the Utah Court of Appeals and the resultant increase in the number of appellate bodies within the Utah judiciary, standards of review have assumed heightened importance. Now, multiple panels of the court of appeals attempt to interpret and build upon our pronouncements on this subject. A lack of careful attention on the part of this court to the articulation and application of standards of review is something the Utah court system can no longer afford.[10]

In part because we have been less than clear about the appropriate standard of review for voluntariness of consent determinations, various panels of the court of ap-

<hr />

10. It is some consolation that in the federal system, where the proliferation of appellate panels and courts for over a century would be expected to have generated close attention to this area of the law long ago, many questions regarding standards of review remain unresolved. *See, e.g.,* Evan Tsen Lee, *Principled Decision Making and the Proper Role of Federal Appellate Courts: The Mixed Questions Conflict,* 64 S.Cal.L.Rev. 235, 235 (1991).

peals have disagreed as to whether the issue of voluntariness is solely one of fact, to be governed by the clearly erroneous standard of review, *see, e.g., Sykes,* 840 P.2d at 831–37, 840 (Jackson, J., concurring, joined in part by Bench, J., dissenting); *State v. Grovier,* 808 P.2d 133, 137 n. 1 (Utah Ct.App.1991); *State v. Sterger,* 808 P.2d 122, 126 n. 5 (Utah Ct.App.1991); *State v. Marshall,* 791 P.2d 880, 887 (Utah Ct.App.1990); *State v. Webb,* 790 P.2d 65, 82 (Utah Ct.App.1990), or is a mixed question of law and fact, in which the trial court's ultimate conclusion of voluntariness is reviewed for correctness and the court's underlying factual findings are upheld unless clearly erroneous, *see, e.g., State v. Sepulveda,* 842 P.2d 913, 914–16 (Ct.App. 1992); *State v. Vigil,* 815 P.2d 1296, 1301 (Utah Ct.App.1991); *State v. Hargraves,* 806 P.2d 228, 231 (Utah Ct.App.1991); *State v. Bobo,* 803 P.2d 1268, 1272 (Utah Ct.App.1990). This split among the panels persists. Today we settle the matter.

Before considering the appropriate standard of review for all Utah appellate courts to apply to voluntariness of consent determinations, we take this opportunity to note our uneasiness with the persistence of the division in the court of appeals on this issue. To the extent that this disagreement simply represents an evolution of two conflicting interpretations of the same legal doctrine by different panels of judges, its persistence is contrary to the doctrine of stare decisis. This doctrine, under which the first decision by a court on a particular question of law governs later decisions by the same court, is a cornerstone of Anglo–American jurisprudence that is crucial to the predictability of the law and the fairness of adjudication. *See* 1B James Wm. Moore et al., *Moore's Federal Practice* ¶ 0.401, at 3, ¶ 0.402[1], at 5–12, ¶ 0.402[2], at 28 (1992) [hereinafter Moore]. The very viability of the common law depends in large part on the doctrine. "[N]o judicial system could do society's work if it eyed each issue afresh in every case that raised

it." *Planned Parenthood of Southeastern Pennsylvania v. Casey,* —— U.S. ——, ——–——, 112 S.Ct. 2791, 2808, 120 L.Ed.2d 674, 699–700 (1992) (opinion of O'Connor, Kennedy, and Souter, JJ.) (citing Benjamin N. Cardozo, *The Nature of the Judicial Process* 149 (1921)).

Although the doctrine is typically thought of when a single-panel appellate court is faced with a prior decision from the same court, stare decisis has equal application when one panel of a multi-panel appellate court is faced with a prior decision of a different panel. *See, e.g., Opsal v. United Servs. Auto. Ass'n,* 283 Cal.Rptr. 212, 216 (Ct.App.1992); *Commonwealth v. Crowley,* 413 Pa.Super. 554, 605 A.2d 1256, 1257 (1992); *Commonwealth v. Burns,* 240 Va. 171, 395 S.E.2d 456, 457 (1990); *see also* Moore ¶ 0.402[1], at 19 (noting general federal rule that "a decision of a panel constitutes a decision of the court and carries the weight of stare decisis in a subsequent case before the same or different panel"). *See generally* 21 C.J.S. *Courts* § 140 (1990). Any other rule would produce unacceptable indeterminacy in the law and would undermine confidence in its institutions. If stare decisis had no application to a multi-panel court such as the court of appeals, it would sanction a judicial system under which the outcome of an appeal presenting a particular legal question would be dependent more on the composition of the panel hearing the case than on whether the issue has been previously addressed and decided by that court. It is one thing to admit that differences among judges on a particular legal question can exist; it is quite another to sanction variability in the rule of law depending solely on which of several judges of an appellate court sit on a given case.

We return to the standard of review issue. We have already noted that our cases addressing the voluntariness of consent for Fourth Amendment purposes offer little guidance in establishing the

standard of review.[11] The court of appeals, however, has addressed this issue in considerably more depth than we have. The leading opinion from the court of appeals on the issue is *Vigil*, 815 P.2d 1296. In that opinion, written by Judge Orme, the majority advocated using different standards of review to address the different subsidiary rulings that the trial court makes in determining admissibility.[12] Specifically, the *Vigil* court proposed using the correctness standard to review the trial court's ultimate voluntariness determination and the clearly erroneous standard to review the underlying factual findings. *Id.* at 1301. The court reasoned that, inter alia, this

11. In *State v. Ramirez*, 817 P.2d 774 (Utah 1991), we noted some inconsistency among statements made in our prior decisions as to the standard of review for trial court determinations of the voluntariness of confessions and the suggestiveness of witness identifications. Some of our cases said that the standard was abuse of discretion, while others said it was clear error, but in all these cases, this court appears to have applied the correctness standard to the ultimate conclusion. *Id.* at 781 n. 3. The *Ramirez* opinion attempted to explain the source of this inconsistency. We observed that there are really several standards of review at work in such cases because a ruling on admissibility, like many other trial court rulings phrased as an ultimate conclusion, really embodies several subsidiary rulings, e.g., one determining the facts to which the law will be applied and another applying the law to the determined facts. Each of these rulings, *Ramirez* said, should be reviewed under a standard appropriate to that ruling alone. *Id.* at 781–82 n. 3.

In the course of this explanation in *Ramirez*, we made several statements that, in retrospect, are either unclear or incorrect and that have introduced some confusion into subsequent discussions of standards of review. One statement in *Ramirez* needing further clarification was the basis for a recent concurring opinion by Judge Jackson of the court of appeals in *Sykes*, 840 P.2d at 831, in which he criticized *Ramirez*'s standard of review discussion. Judge Jackson read *Ramirez*'s footnote three as indicating that appellate courts should review findings of fact underlying a trial court's decision to admit or exclude a certain item of evidence under a correctness standard, thus giving no deference to the trial court's factual findings. *Id.* The particular statement in footnote three on which he based his criticism is admittedly confusing. It states, "In reviewing the trial court's decision to admit, which includes the determination of what version of facts to believe, we review for correctness." 817 P.2d at 782 n. 3. To the extent this statement appears to collapse two standards of review, one for factual findings and the other for legal rulings, into one standard, it is incorrect. However, a close reading of the footnote as a whole, and the entire *Ramirez* opinion, demonstrates that we did not intend to say that findings of fact made by a trial court during the course of a suppression hearing involving live testimony are reviewed by any standard other than the clear error standard. Subsequent language in the footnote makes this plain: "[A] review of the trial court's resolution of factual questions and the associated determination of credibility that may underlie the decision to admit ... will be overturned *only if clearly erroneous*." *Id.* (emphasis added).

A second statement in footnote three of *Ramirez* also deserves comment: "Whether a piece of evidence is admissible is a question of law, and we always review questions of law under a correctness standard." *Id.* at 781 n. 3. If that statement were literally true, we would not have gone on to discuss the fact that an admissibility decision is the sum of several rulings, each of which may be reviewed under a separate standard. But that statement of the standard of review is not correct, even if the correctness standard is applied only to the trial court's ultimate conclusion to admit or exclude the proffered evidence.

As discussed in the text above, standards of review set the limits of a trial court's discretion when it is determining a particular issue. Standards of review differ because each reflects a different policy judgment by the entity fixing the standard, whether the framers of the constitution, the legislature, or the appellate courts, that a different amount of discretion will be permitted the trial judge or other finder of fact in passing upon the issue in question. For example, the most common standards of review, clear error for findings of fact, abuse of discretion or reasonability for rulings requiring a balancing of factors, and correctness for conclusions of law, can each be viewed as granting progressively less discretion to the trial judge and placing more responsibility on the appellate court. *See generally* Rosenberg at 180. Taken collectively, all such standards are law, and whether a trial judge has exceeded the scope of the discretion granted to him or her is a legal question. To the foregoing extent, then, the statement in *Ramirez* that admissibility is always a question of law is correct. But the rest of the statement—that a correctness standard is to be applied in reviewing each such ruling—is not.

12. Judge Orme was joined by Judge Greenwood. Judge Bench dissented, arguing, inter alia, that a sole standard of review—the clearly erroneous standard—should be applied to voluntariness of consent determinations. *Vigil*, 815 P.2d at 1303.

two-standard approach takes into account the relative functions of the trial and appellate courts while ensuring the consistent and uniform protection of a fundamental civil liberty. *Id.* at 1299–1300. On one hand, the application of the clearly erroneous standard to the trial court's factual findings recognizes the trial court's advantaged position in judging credibility and resolving evidentiary conflicts. *Id.* at 1299. On the other hand, the application of the correction standard to the trial court's ultimate voluntariness determination acknowledges that a single trial judge is in an inferior position to determine what the legal content of voluntariness should be and that a panel of appellate judges, with their collective experience and their broader perspective, is better suited to that task. Also, the decision of the appellate panel is published, thereby providing state-wide standards that guide law enforcement and prosecutorial officials. *Id.* at 1299–1300.

> Therefore, while the trial court is primarily concerned with the proper resolution of factual issues under the controlling law, the appellate court addresses itself to the clarity and correctness of the developing law in order to provide unambiguous direction to those whose further rights and responsibilities are affected.

*Id.* at 1300.

We think this line of reasoning is sound. As the *Vigil* court implicitly recognized, the concept of "voluntariness" reflects a balance between the need for effective law enforcement and society's belief that the coercive powers of law enforcement must not be unfairly exercised. *See Schneckloth,* 412 U.S. at 225, 93 S.Ct. at 2046–47. Declaring whether certain police conduct is or is not unfairly coercive sets the norms that fix the limits of acceptable police behavior. There can be little question that establishing such norms involves substantive policy judgments and that such norms should have jurisdiction-wide application. *See* Monaghan at 273–74. These are functions classically reserved to multi-judge appellate panels. In short, what constitutes unfairly coercive police behavior should not vary from courtroom to courtroom within Utah. This end is best accomplished by viewing the ultimate conclusion that consent was voluntary or involuntary as a question of law, reviewable for correctness.

It has been argued that applying the correctness standard of review to the ultimate voluntariness determination and the clearly erroneous standard of review to the underlying factual findings is "redundant and wasteful" and creates a system where trial court decisions to admit evidence resulting from a "voluntary" search will be automatically appealed. *Sykes,* 840 P.2d at 831 & n. 3 (Jackson, J., concurring). This contention is grounded on the assumption that by reducing the trial court's discretion to make the ultimate voluntariness determination, parties are encouraged to seek appellate review in hope of a better result. *See id.* However, a considerable body of case law on the voluntariness of consent already exists, and the law is developing at a rapid pace. As a result, the contours of the law in this area are quickly taking form, and as with most developing legal doctrines, each new opinion narrows the universe of unsettled questions requiring appellate review. Moreover, even if the adoption of the clearly erroneous standard would ensure a more manageable (i.e., smaller) appellate docket, this is no reason in itself to adopt the clearly erroneous standard of review for voluntariness of consent determinations. As Professor Rosenberg puts it, "[T]he trouble with that reason is that it is non-discriminating. It could apply to any and every question. It does not offer any guidance as to which rulings should be [deferentially] reviewed and which should not." Rosenberg at 181.

We hold that the trial court's ultimate conclusion that a consent was voluntary or involuntary is to be reviewed for correctness. *Cf. Ramirez,* 817 P.2d at 781–82. The trial court's underlying factual findings will not be set aside unless they are found to be clearly erroneous. *Id.*

Turning to the second prong of *Arroyo,* we hold that the trial court's determination

of exploitation (or attenuation) also should be reviewed under the same standards. Thus, the trial court's ultimate conclusion that the consent was or was not obtained in the course of prior illegal police conduct is to be reviewed for correctness, and the court's underlying factual findings are to be reviewed under the clearly erroneous standard. Much of the foregoing discussion supports our adoption of this approach with respect to reviewing exploitation determinations, and further elaboration is unnecessary. We note, however, that the exploitation determination is especially policy laden. As Justice Powell explained in *Brown*, "The notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." 422 U.S. at 609, 95 S.Ct. at 2264 (Powell, J., concurring), *quoted in part in Arroyo*, 796 P.2d at 688. The "cost" to which Justice Powell referred is the cost of exclusion to society's interest in having all the relevant evidence before the jury so that it may best exercise its fact-finding function. *See Ceccolini*, 435 U.S. at 275–76, 98 S.Ct. at 1059–60 (quoting *Alderman v. United States*, 394 U.S. 165, 174–75, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969)); *see also* 4 *Search & Seizure* § 11.4(a), at 372–73. "In short, the underlying purpose of the 'attenuated connection' test is to mark 'the point of diminishing returns of the deterrence principle.'" 4 *Search & Seizure* § 11.4(a), at 373 (citing Amsterdam at 390). Such a policy determination must be made by appellate courts.

We return to the merits. The trial court found that both of Thurman's consents to search the storage unit satisfied *Arroyo*. However, we do not need to determine if the trial court erred in finding that Thurman's first consent is valid because we hold that the trial court was correct in finding that his second consent was valid. None-

theless, the officers' conduct prior to and during Thurman's first consent deserves comment because it created an atmosphere that would appear to be objectively inconsistent with a voluntary consent.

The Utah knock-and-announce statute obviously anticipates that the occupant of the target residence will have the opportunity to answer the door, thus maintaining some control over his or her abode and keeping the encounter with the police on a civil basis. *Cf. State v. Carufel*, 112 R.I. 664, 314 A.2d 144, 147 (1974). Nothing in the facts suggests that if the agents had complied with the statute, Thurman would not have awakened, dressed, and answered the door. Rather than allowing Thurman to retain some control over the encounter, six agents burst into his small apartment with weapons drawn, routed him out of bed, handcuffed him behind the back while he was naked (somehow producing a bloody nose in the process), and commenced the search.

■ Adding to the air of intimidation was the statement by one of the agents, made when Thurman hesitated to sign the first consent form, implying that a refusal to sign the form was futile and that the police would undertake the search in any event. Although this statement probably was true, *see State v. Bobo*, 803 P.2d 1268, 1274 & n. 7 (Utah Ct.App.1990), and is not per se coercive, *see United States v. Hummer*, 916 F.2d 186, 190 (4th Cir.1990); *United States v. Twomey*, 884 F.2d 46, 51–52 (1st Cir.1989),[13] it contributed significantly to a coercive atmosphere. *See* 3 *Search & Seizure* § 8.2(c), at 187–88.

However, as noted above, we conclude that the legality of the search of the storage unit does not depend on the validity of Thurman's first consent because we find that the trial court did not err in determining that Thurman's second consent was valid.

■ We address the trial court's legal conclusion that Thurman's second con-

---

**13.** The search warrant served on Thurman specifically contemplated finding "documentation or information pertaining to the storage … of destructive devices."

sent was voluntary. The facts are not in dispute. Thurman testified at the suppression hearing that he gave his first consent voluntarily, and we do not find any indication in the record that would lead us to conclude that he did not likewise give his second consent voluntarily. Indeed, he gave his second consent in a much calmer setting, far removed from the events of that morning. Five hours had passed since the illegal entry, Thurman had been given his *Miranda* warning a second time, and he had not requested an attorney but agreed to talk to the agents. Paramedics had treated him, and he was allowed to dress. When he and the officers traveled to the storage unit, he was not in handcuffs, and once at the storage unit, he remained free to move about. Thurman himself opened the combination lock to the unit. After it was unlocked, Agent Conner again explained the consent form to Thurman while the other officers waited outside the unit.

We acknowledge that the trial court found that Thurman had been in custody and "essentially shackled for six hours" prior to giving his second consent. However, on appeal, he does not claim that his detention or the means by which he was detained was improper, nor do we see any obvious basis in the record for such a claim. *See Michigan v. Summers*, 452 U.S. 692, 699, 101 S.Ct. 2587, 2592, 69 L.Ed.2d 340 (1981); *United States v. Kon Yu–Leung*, 910 F.2d 33, 41 (2d Cir.1990). The fact of custody alone is not enough in itself to establish improper coercion. *See State v. Whittenback*, 621 P.2d 103, 106 n. 14 (Utah 1980); *Bobo*, 803 P.2d at 1273–74. Under these circumstances, we conclude that the trial court did not err in determining that Thurman's second consent was voluntary. *See Arroyo*, 796 P.2d at 687; *State v. Griffin*, 626 P.2d 478, 480 (Utah 1980); *State v. Durand*, 569 P.2d 1107, 1108–09 (Utah 1977).

We next address the trial court's legal conclusion that the connection between the prior police illegality and Thurman's second consent was sufficiently attenuated so as not to invalidate the search. For purposes of this analysis, we assume, without deciding, that the officers' violation of the knock-and-announce statute constitutes an abridgement of Thurman's Fourth Amendment rights. We also note that the parties are not in disagreement as to what transpired between the illegality and Thurman's second consent.

We first consider the purpose and flagrancy of the police conduct to determine whether a clean break in the chain of events between the conduct and the second consent, such as consultation with counsel, was required. Although the trial court did not make any findings as to the purpose or flagrancy of the officers' behavior, the record is sufficient for us to make this determination. *See Sims v. Collection Div. of the State Tax Comm'n*, 841 P.2d 6, 10 (1992); *State v. Small*, 829 P.2d 129, 130–32 (Utah Ct.App.1992); *State v. Castner*, 825 P.2d 699, 704 (Utah Ct.App.1992); *cf. Brown*, 422 U.S. at 604, 95 S.Ct. at 2262. On one hand, the illegal entry of the officers appears to have been intentional. Agent Conner in his affidavit specifically sought no-knock authority, which the magistrate clearly denied. Yet, as the trial court stated, "It appears that the officers took it upon themselves to execute the lawful warrant in an unlawful manner." Also, the entry was conducted in a manner that appears to be calculated to cause at least surprise, if not confusion and fright. *See Brown*, 422 U.S. at 605, 95 S.Ct. at 2262–63; *Delgadillo–Velasquez*, 856 F.2d at 1300.

On the other hand, the record indicates that the purpose of the illegal entry was not made to facilitate the search for evidence or to intentionally deprive Thurman of his rights. *See Brown*, 422 U.S. at 605, 95 S.Ct. at 2262–63; *United States v. George*, 883 F.2d 1407, 1416 (9th Cir.1989); *cf. Delgadillo–Velasquez*, 856 F.2d at 1300. Rather, as the trial court noted, the officers had some concern for their own safety, and this appears to have influenced their behavior. More importantly, the offi-

cers were acting under a valid warrant that authorized them to undertake the search that ultimately was made and that presumably would have led them to the storage unit. *Cf. Nix v. Williams,* 467 U.S. 431, 444–48, 104 S.Ct. 2501, 2509–11, 81 L.Ed.2d 377 (1984) (holding that if prosecution shows that unlawfully obtained evidence ultimately or inevitably would have been discovered by lawful means, evidence is admissible); *Buck,* 756 P.2d at 703 (finding evidence admissible even though police failed to announce presence and intent prior to entry as required by warrant because target residence was unoccupied at time of entry). In light of these facts, we conclude that a clean break in the chain of events between the misconduct and the second consent, such as that envisioned by Justice Powell in *Brown,* was not required.

We next consider the lapse of time and presence or absence of intervening events. The second consent was given five hours after the illegal entry, when the frenzy of the entry and subsequent search had abated and Thurman had been advised of his *Miranda* rights for the second time. Although Thurman had been handcuffed for approximately six hours, the officers removed the handcuffs while in transit to the storage unit, where they remained off during an agent's explanation of the consent form to Thurman and Thurman's subsequent signing of the form. The form Thurman signed stated that he had been informed of his "constitutional right not to have a search made of the premises described below without a search warrant and of my right to refuse to such a search." Agent Conner testified at the suppression hearing that the second consent was obtained because he was concerned that the first consent may have been vitiated by the passage of time. He denied having any concern that the first consent may have been tainted by the illegal entry.

Based on these and other facts discussed elsewhere in this opinion, we think there is little likelihood that the officers purposely or negligently exploited the illegal entry and subsequent confusion to obtain Thurman's consent. Consequently, any deterrent value to be gained by suppressing the evidence found in the storage unit is, at best, minimal. Moreover, whatever deterrent value may result from suppression in this case is greatly outweighed by society's interest in placing all relevant evidence before the jury. We therefore hold that even if the officers' illegal entry into Thurman's apartment violated the Fourth Amendment, it was sufficiently removed from his second consent so as not to invalidate the subsequent search.

In sum, we hold that the trial court did not err in finding that Thurman's second consent to search the storage unit was valid. The trial court's order admitting the evidence is affirmed.

HALL, C.J., HOWE, Associate C.J., and STEWART and DURHAM, JJ., concur.